FILED

2012 Mar-07  PM 02:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **DARRIEST LIKES,** *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| **v.** ) | Civil Action Number |
| ) | **2:08-cv-00428-AKK** |
| **DHL EXPRESS (USA), INC.,** *et* ) | |
| *al.*, ) | |
| ) | |
| Defendants. ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs Darriest Likes ("Likes"), Terry Lowe ("Lowe"), and Gerald

Sanders ("Sanders") (collectively, Plaintiffs) bring this civil action on behalf of

themselves and all those similarly situated against Wood Air-Freight, Inc. ("Wood

Air"), Thomas Wood ("Wood"), and DHL Express (USA), Inc. ("DHL") for

violations of section 216(b) of the Fair Labor Standards Act of 1938 ("FLSA").

Doc. 25.  Wood Air and Wood, jointly, and DHL filed separate motions for

summary judgment, docs. 91 & 92, which are fully briefed, docs. 98, 99, 106, &

107.  DHL also moved to strike the declarations Plaintiffs filed in opposition to

summary judgment.  Doc. 105.  For the reasons stated below, DHL's motion for

summary judgment is **GRANTED** and its motion to strike is **DENIED**.[1]

Furthermore, Wood Air and Wood's motion for summary judgment is **GRANTED**

as it relates to Katrina Nunnally and Plaintiffs' pre-August 10, 2005, claims for

overtime, and **DENIED** in all other respects.

Part I of this opinion is a discussion of the summary judgment standard.  In

Part II, the court outlines the facts that form the basis for this lawsuit.  Part III is the

court's analysis of the parties' respective contentions and it is divided into two

subparts.  In subpart A, the court analyzes DHL's alleged joint employer liability

under the FLSA, and in subpart B, the court analyzes Wood Air and Wood's

alleged liability to Plaintiffs for overtime wages.  Finally, Part IV is the court's

conclusion.

## I. <u>SUMMARY JUDGMENT STANDARD OF REVIEW</u>

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary

judgment is proper "if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  To support

a summary judgment motion, the parties must cite to "particular parts of materials

---

[1]DHL moved to strike Plaintiffs' declarations because Plaintiffs limited the number of party Plaintiffs deposed, and, yet "instead of relying upon that representative deposition testimony in opposing DHL's Motion for Summary Judgment, Plaintiffs submit declarations from some of those very parties who were deposed." Doc. 105, at 24.  In its discretion, the court will consider Plaintiffs' declarations since they aid the court in determining the joint-employer issue.  Therefore, the motion to strike is **DENIED**.

in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c).  Moreover, "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323.  The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id*. at 324 (citation and internal quotation marks omitted).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor).  However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir.

2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)).  Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party."  *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II. <u>FACTUAL BACKGROUND</u>

When evaluating the motions for summary judgment, the court resolves all factual disputes in Plaintiffs' favor "when sufficient, competent evidence . . . supports Plaintiff[s'] version of the disputed facts."  *See Pace v. Capobianco*, 283 F.3d 1275, 1276, 1278 (11th Cir. 2002).

### A.    <u>The Parties</u>

DHL provides shipping and logistical services through a network of gateways, hubs, warehouses, and terminals to support its customers' needs.  Doc. 92-1, at 25:16-26:6.  Depending on the needs, DHL contracts with independent contractors to service specific territories for parcel pick-up and delivery.  Doc. 92-2, at 22:24-23:19.  Allegedly, DHL and the independent contractors have no corporate affiliation and share no common owners, shareholders, or decision

makers.[2]  Doc. 92-3, at 8:5-23.

One of DHL's contractors was Wood Air, which operated from 1981 until February 2009.  Doc. 92-3, at 36:6-12; 38:10.  Wood was the president and owner of Wood Air.  Doc. 92-3, at 9:9-17; 34:15.  Between 2005-2009, Wood Air contracted with DHL to pick-up and deliver packages in the Birmingham, Alabama area.  Doc. 92-3, at 38:4-11.  DHL and Wood Air signed a Cartage Agreement, in which they outlined the terms of their relationship.  Doc. 92-3, at 9:18-10:14.

Wood Air employed Plaintiffs as couriers who primarily picked-up and delivered packages.  Doc. 92-3, at 53:17-54:14.  Plaintiffs spent approximately 90% of their work day in their delivery vehicles out on their assigned routes.  Doc. 92-6, at 26:7-13.  Wood Air required Plaintiffs to know how to drive, read a map, sort packages, operate the DHL scanner, and know the quickest routes between addresses in the delivery areas.  *Id.*, at 24:17-25:11; doc. 92-3, 54:3-56:13.  Wood Air set Plaintiffs' salary and made the decision to pay Plaintiffs a fixed salary.  Doc. 92-3, at 64:5-65:20, 68:17-68:22, 69:22-70:10; doc. 92-6, at 26:20-27:13.\

---

[2] Plaintiffs contend that DHL and Wood Air shared common decision makers because DHL employees directed Plaintiffs to perform various duties on a daily basis.  Doc. 98, at 4 ¶ ii.

**B.** **Contractual Relationship Between DHL and Wood Air**

      **i.** **Cartage Agreement and Accompanying Schedules**

In addition to the Cartage Agreement, DHL and Wood Air also negotiated accompanying Schedules, which covered (1) payments to Wood Air, (2) contract performance, and (3) Wood Air's use of DHL logo and branding. Doc. 92-3, at 45:6-16, 166:23-168:3. Additionally, either Wood Air or DHL could renegotiate the terms of the Schedules, conduct business with non-competitors,[3] and terminate the Cartage Agreement for cause by written notice. Doc. 92-3, at 11:1-5; doc. 92-5, at 14 ¶ 3.14, 18 ¶ 11.1.

The parties disagree on the extent of the relationship between Wood Air and DHL. Specifically, DHL and Wood Air contend the Cartage Agreement, which they renegotiated annually, and its accompanying Schedules governed their entire contractual relationship. Doc. 92-5, at 2 ¶ 7; doc. 92-5, at 10 ¶ 1. Plaintiffs disagree because they maintain that, contrary to the terms of the Cartage Agreement, DHL employees frequently directed and issued commands to Wood Air employees. Doc. 98, at 6.

The Cartage Agreement required Wood Air employees to wear badges

---

    [3] In fact, DHL contracted with two other companies – Territory Reps, Inc. and Sky Land Express, Inc. – that also operated from DHL's Birmingham facility during the same time frame as Wood Air. Doc. 92-1, at 39:1-19.

identifying them as employees of Wood Air-Freight, an Independent Contractor for DHL Express.  Doc. 92-3, at 13:22-14:4; doc. 92-5, at 40 ¶ 6.2.  Also, Wood Air delivery vehicles, which DHL paid Wood Air $38 per vehicle to help maintain, contained DHL's mark and the phrase "Operated By Wood Air-Freight" on the driver and passenger doors.  Doc. 92-5, at 38 ¶ 4.2; doc. 92-3, at 124:6-126:7.

### ii.     Administrative Agreement and Lease of Personal Property

DHL and Wood Air also negotiated Administrative Agreements and Leases of Personal Property to specifically cover Wood Air's leasing of real and personal property from DHL.  Doc. 92-5, at 43; *id.*, at 45.  The agreement granted Wood Air "reasonable use" of DHL's Birmingham premises for $30.00 per month and also covered Wood Air's use of DHL's hand-held scanning devices on a month-to-month basis.  Doc. 92-5, at 3 ¶ 9, 43, 45.[4]  Either party could terminate the Administrative and Lease of Personal Property Agreement with thirty days written notice.  Doc. 92-5, at 43.

### C.     Wood Air's Operations and Workforce and DHL's Alleged Joint Control

Defendants contend that Wood Air had sole discretion in performing its obligations under the Cartage Agreement, including hiring and firing its

---

[4] The Administrative Agreement provided to the court is from 2007.  Doc. 92-5, at 43.  Wood contends he paid $50 initially for use of the premises.  Doc. 92-3, at 87:5-91:18.

employees.  Doc. 92, at 12 ¶ 20; doc. 92-3, at 12:1-21;doc. 92-5, at 11 ¶ 3.3.

Plaintiffs dispute this fact and maintain instead that DHL had joint discretion since

DHL controlled work schedules, and required Wood Air drivers to undergo drug

and alcohol tests, and background screening.  Doc. 92-5, at 12 ¶ 3.4.3-3.4.4; doc.

98, at 8 ¶ 24.  Wood and Wood Air maintain that Wood Air set work schedules and

decided route assignments for its employees.  The parties agree that DHL contacted

Wood Air directly, instead of Plaintiffs, to address problems with packages,

complaints, late aircrafts, late trucks, and service problems.  Doc. 92-3, at 12:1-

13:21, 73:11-21; doc. 92-6, at 26:23-27:5; doc. 92-12, at 15:9-11.  Pursuant to the

Cartage Agreement, DHL audited Wood Air's operations related to DHL services

periodically, doc. 92-5, at 18 ¶ 10.3, and routinely communicated with Wood and

other managerial personnel to ensure that DHL received the contracted services,

doc. 92-3, at 72-73.  Wood Air maintains DHL did not supervise Plaintiffs, that

Plaintiffs reported to Wood Air managers instead, and that DHL directed all of its

concerns either directly to Wood or other managers.  Doc. 92-3, at 21:12-23:20.

### i.     Wood Air's Facilitated Dispatch Services to its Couriers

Plaintiffs' workday began around 6:30 a.m., sorting the DHL freight which

arrived at the warehouse in containers from the airport each morning.  Doc. 92-3, at

66:11-15, 154-156:8.  After sorting the packages, Plaintiffs scanned and loaded to

their vehicles the packages corresponding with their assigned routes.  *Id.*  Before

Plaintiffs left the warehouse, Wood Air randomly audited the delivery vehicles to

verify that Plaintiffs scanned all the packages slated for delivery.  Doc. 92-3, at

158:22-160:16.  Throughout the day, Wood Air personnel at the DHL facility

communicated with Plaintiffs to inform them of pick-ups on their routes.  Doc. 92-

3, at 99-105.  However, occasionally, DHL contract dispatch, Territory Reps,

contacted Plaintiffs directly about pick-ups.  *Id.*; doc. 92-5, at 5 ¶ 20.  Furthermore,

Plaintiffs could not return to the warehouses until after the 5:30 p.m. DHL cut-off

time for customer pick-ups.  Doc. 92-3, at 138:1-22.

At the end of the work day, DHL required Plaintiffs to place their DHL-

issued scanners in a cradle to charge overnight.  Doc. 92-5, at 112:22-113:20.  The

scanner communicated the delivery and pick-up information from that day directly

to a DHL computer.  *Id.*  DHL used the data to generate reports prior to meeting

with Wood Air management to discuss Plaintiffs' performance.  Doc. 92-3, at 79-

80.  However, when an issue materialized, DHL never contacted Wood Air

employees directly.  Instead, DHL contacted Wood personally to request that he

address the issues with the Wood Air employee in question.  Doc. 92-3, at 80:4-23.

### D.    <u>Wood Air's Packages and Vehicles</u>

The freight and packages Plaintiffs handled traveled in interstate commerce.

Doc. 92-3, at 39:6-39:18, 165:18-166:4.  Generally, Plaintiffs operated delivery vehicles that weighed less than 10,000 lbs.  *Id.*, at 83:7-85:18.  However, allegedly, Wood Air occasionally rented, and expected Plaintiffs to drive, trucks weighing more than 10,000 lbs during busy periods or to handle larger freight.  Doc. 92-3, 14:1–14:20; 14:10-20; 84:18-86:19.

### III.  ANALYSIS

Plaintiffs allege that Defendants violated the FLSA by failing to pay them overtime and that Wood Air and DHL are joint employers within the meaning of the FLSA.  Doc. 7, at 1, 6.  Defendants move separately for summary judgment on all claims against them.  Doc. 91& 92.  The court will address first DHL's contention that it is not Plaintiffs' joint employer.

### A.    DHL's Joint Employer Liability

Plaintiffs seek to hold DHL liable for their unpaid overtime wages claim on a joint liability theory.  Doc. 25, at 6.  Under the FLSA, an "employee" is defined as "any individual employed by an employer."  29 U.S.C. § 203(e)(1).  An "employer" "includes any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ."  *Id.*, at § 203(d).  "A single individual may stand in the relation of an employee to two or more employers at the same time under the [FLSA] . . . , since there is nothing in the act which prevents an individual

10

employed by one employer from also entering into an employment relationship with a different employer." 29 C.F.R. § 791.2(a). If the facts show that an employee is jointly employed by two or more employers, then that employee's work for the entire workweek is considered as one employment under the FLSA. *Id.* Therefore, "[i]n this event, all joint employers are responsible, both individually and jointly, for compliance with all of the applicable provisions of the [FLSA], including overtime provisions, with respect to the entire employment for the particular workweek." *Id.*

Moreover, a joint employment situation may arise:

(b) Where the employee performs work which simultaneously benefits two or more employers, or works for two or more employers at different times during the workweek, a joint employment relationship generally will be considered to exist in situations such as:

(1) Where there is an arrangement between the employers to share the employee's services, as, for example, to interchange employees; or

(2) Where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or

(3) Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.

29 C.F.R. § 791.2(b).

Whether joint employment status exists is a question of law. *Tafalla v. All Florida Dialysis Services, Inc.*, No. 07-80396, 2009 WL 151159 at *5 (S.D. Fla. Jan. 21, 2009) (citing *Antenor v. D & S Farms*, 88 F.3d 925, 929 (11th Cir. 1996)). In this circuit, the "economics realities" test is utilized to analyze "the relationship between the plaintiff and the putative employer . . . to determine whether the surrounding circumstances show that the plaintiff is economically dependent on the putative employer." *Tafalla*, 2009 WL 151159 at *5; *see also Aimable v. Long and Scott Farms*, 20 F.3d 434, 439 (11th Cir. 1994). Economic dependency, in turn, is contingent on eight factors: (1) the nature and degree of the alleged joint employer's control over the employees; (2) the degree of supervision over work, either direct or indirect; (3) the alleged joint  employer's right, directly or indirectly, to hire, fire, or modify the employees' employment conditions; (4) the power to determine the employees' pay rates or methods of payment; (5) the alleged joint employer's preparation of payroll and payment of the employees' wages; (6) the ownership of the facilities where the work occurred; (7) the employees' performance of a line-job integral to the alleged joint employer's business; and (8) the alleged joint employer's relative investments in equipment and facilities. *Antenor*, 88 F.3d at 932; *Tafalla*, 2009 WL 151159 at *5.

No one factor is determinative.  Rather, in analyzing the eight factors, "[t]he focus of each inquiry . . . must be on each employment relationship as it exists between the [employee] and the party asserted to be a joint employer." *Antenor*, 88 F.3d at 932.  Furthermore, the weight of each factor depends on the light it sheds on the employee's economic dependence, or lack thereof, on the alleged employer.  *Id.*  "The absence of evidence on any one or more of the criteria listed does not preclude a finding that an . . . [alleged] employer was a joint employer along with the [actual employer]." *Id.*, at 933.  Ultimately, the existence of a joint employment relationship depends on "the 'economic reality' of all the circumstances." *Id.*, at 932.  Finally, because the FLSA is a remedial statute, it is construed broadly. *Id.*, at 933.

The court turns now to analyzing the eight factors to ascertain whether Plaintiffs have met their burden of establishing DHL as their joint employer.

### 1.    Nature and Degree of Control

Control arises when the alleged joint employer determines the number of workers hired, when work begins on a particular day, which workers are assigned to specific tasks, and whether a worker is disciplined or retained. *Antenor*, 88 F.3d at 933; *Tafalla*, 2009 WL 151159 at *7.  Plaintiffs contend that DHL controlled them because DHL required Wood Air to only hire individuals who

passed an alcohol and drug screen and a background check, and that DHL directed

Plaintiffs on how to do their jobs.  Doc. 98, at 7-8 ¶ 21.  Plaintiffs, however,

conflate DHL's concerns to ensure that it complied with DOT regulations about

drug and alcohol testing and that only individuals without criminal backgrounds

visited its customers, with control over their hiring and employment.  That Wood

Air presumably would have withdrawn an offer if a prospective employee failed

her drug and alcohol screen or background check did not negate that Wood Air

made the actual decision to hire that individual and also conducted the drug and

alcohol screens and background checks without any input from DHL.  Indeed,

Wood testified that Wood Air chose how many people it hired, decided Plaintiffs'

schedules, and interviewed Plaintiffs without DHL's assistance.  Doc. 92-3, at

12:1-18.  In fact, Plaintiffs confirm that Wood Air interviewed and offered them

employment, doc. 92-10, at 12:3-11; doc. 92-11, at 11:2-17; doc. 92-8, at 16:8-16,

and told them when they needed to report to work and when their day ended, doc.

92-3, at 12:1-18, doc. 92-6, at 26:23-27:5, doc. 92-12, at 15:9-11; doc. 92-10; at

16:16-17:6.  Furthermore, Wood Air, not DHL, changed the start of the workday

from 6:00 a.m. to 6:30 a.m. when business tapered off.   Doc. 92-3, at 66:11-15.

　　　All these facts belie Plaintiffs' contention that DHL controlled their

employment.  While DHL required Wood Air to screen Wood Air prospective

employees for alcohol and drugs and to conduct a background check, the unrebutted evidence shows that Wood Air hired Plaintiffs and controlled the terms of their employment, including scheduling and discipline. Accordingly, this factor does not support a finding of joint employment.

### 2.      Degree of Supervision Over the Work

"Supervision over work includes overseeing the work and providing direction on a regular, even daily basis." *Tafalla*, 2009 WL 151159 at *7 (citing *Antenor*, 88 F.3d at 935). "[I]t is well settled that supervision is present whether orders are communicated directly to the laborer or indirectly through the contractor. On the other hand, infrequent assertions of minimal oversight do not constitute the requisite degree of supervision." *Martinez-Mendoza v. Champion Intern. Corp.*, 340 F.3d 1200, 1211 (11th Cir. 2003) (citations omitted).

Plaintiffs allege DHL directed and commanded them daily to perform various duties and instructed them on how to perform their duties. Doc. 98, at 5-6 ¶ 9. Specifically, Plaintiffs contend they could sort packages and load their delivery vehicles only when DHL gave the go-ahead. *Id.*, at 12 ¶ 6. Moreover, Plaintiffs allege DHL's employees:

> i.      Supervised the sorting and loading of packages by the drivers;
>
> ii.     Corrected drivers about delivery issues – such as packages that had

been delivered or picked up later or that had never been delivered or picked up, and customer complaints – that the DHL employee observed the day before;

. . .

iv.   Conducted inspections of drivers' vans, which generally required at least 10-15-20 minutes per van, and required all drivers to wait until the audits were complete . . .;

v.   Conducted inspections of drivers' clothing to ensure they were properly wearing their DHL-issued and required uniform; and

vi.   Directed a Wood Air-Freight manager to take corrective action if a driver was not properly wearing his DHL uniform.

Doc. 98, at 13 ¶ 11; doc. 92-3, at 161:23-162:19; doc. 92-11, at 55:14-56:14; doc. 92-12, at 63:19-64:22.

Critically for the court's analysis, although Plaintiffs contend DHL supervised certain aspects of their jobs, Plaintiffs admit that Wood Air primarily managed them on a day to day basis, especially as it relates to discipline.  Doc. 92-6, at 55:3-56:1, 62:20-63:23; doc. 92-8, at 90:16-91:20.  Indeed, Wood Air contends that although DHL reported Plaintiffs that wore improper uniforms, only Wood Air confronted Plaintiffs.  Doc. 92-3, at 162:4-15.  This is consistent with DHL's contention that it dealt with Wood Air, rather than Plaintiffs, on customer issues or other matters.  Doc. 92, at 14 ¶ 26.  The court finds that the minimal oversight DHL provided does not constitute supervision and is permissible

because DHL had a right to ensure that Wood Air employees properly abided by the terms of the Cartage Agreement.  *See Freund v. Hi-Tech Satellite, Inc.*, 185 Fed. Appx. 782, 783 (11th Cir. 2006) (plaintiff is an independent contractor and not defendant's employee where defendant's interest in plaintiff's work was the end result of customer satisfaction and not with day-to-day regulations of plaintiff's work habits, hours worked or work methods).  Therefore, the court finds DHL's enforcement of the Cartage Agreement's terms did not constitute supervision over Plaintiffs and does not support a finding of joint employment.

**3.     Right to Hire, Fire or Modify Employment Conditions**

As discussed above, DHL had no right to hire, fire, or modify Plaintiffs' employment conditions.  Indeed, the Cartage Agreement grants the "sole responsibility" to DHL:

> [T]he manner and means by which Contractor performs the Services shall be at Contractor's sole discretion and control and are Contractor's sole responsibility, including with respect to (a) the hours and days worked by Contractor Workers, (b)the section and supervision of Contractor Workers and (c) the number Contractor vehicles used by Contractor in providing the Services. Contractor shall have the sole right to determine all aspects of its performance of its obligations under this Agreement, including the staffing, operation, and routing of the Contractor Vehicles in the Service Areas.

Doc. 92-5, at 11 ¶ 3.3.  Furthermore, Wood Air required all applicants, including

Plaintiffs, to complete a job application specifically for Wood Air and Wood Air

subsequently made its own hiring decisions.  Doc. 92-6, at 26:14-22; doc. 92-12,

at 13:1-15:11.  Likewise, Wood Air made termination decisions and, in fact,

Plaintiff Kerry Bibb testified that when he lost his job, he learned about the

decision from a Wood Air supervisor.  Doc. 92-10, at 13:13-22.  Additionally,

perhaps even more of an indication of Plaintiffs' perception about the identity of

their employer, the Plaintiffs who resigned admit that they informed Wood Air

only of their decision to resign.  Doc. 92-14, at 20: 4-12; doc. 92-9, at 75:21-76:2.

Thus, the undisputed evidence shows that only Wood Air had the authority to hire,

fire, and modify Plaintiffs' employment conditions.  Therefore, this factor also

does not support a finding of joint employment.

### 4.  Power to Determine Pay Rates or Methods of Payment

"Pay rate refers not only to the amount of compensation to be paid, but

includes benefits such as worker's compensation insurance and social security, as

well as how their various payments are allocated." *Antenor*, 88 F.3d at 936.

Furthermore, "method of payment refers to the basis upon which a worker is paid,

for example, by the hour or by the piece." *Id*.  Here, Wood Air paid Plaintiffs a

fixed salary, without any input from DHL, because, according to Wood, Wood Air

did not make enough money under the DHL contract to pay overtime.  Doc. 92-3,

18

at  64:5-65:7, 68:17-69:21, 69:22-70:10, 71:2-9.  Moreover, after Plaintiffs

initiated this lawsuit, DHL allegedly denied Wood Air's request for DHL to

reimburse Wood Air if this action resulted in an adverse finding against Wood Air.

Doc. 92-3, at 69:13-21.  Critically, Plaintiffs confirm that Wood Air set the

method of payment, the amount of pay, and their raises, if any.  Doc. 92-6, at

26:20-27:13; doc. 92-8, at 16:17-22; doc. 92-10, at 42:6-14.  Thus, Plaintiffs' own

testimony establishes that Wood Air determined their pay rates and method of

payment.  Therefore, this factor also does not support a finding of joint

employment.

### 5.    Preparation of Payroll and Payment of Wages

Preparation of payroll and payment of wages is "probative of joint

employment because of the likelihood that when a business undertakes to help an

independent contractor prepare its payroll and pay its wages, it is likely that the

contractor lacks economic substance on which the workers can solely depend."

*Antenor*, 88 F.3d at 936.  Plaintiffs presented no evidence of any DHL

involvement in the preparation of payroll.  Moreover, Wood testified that he

prepared the payroll for Wood Air and made the employee tax withholdings

determinations.  Doc. 92-3, at 16:22-17:12, 51:7-10.  Significantly, Plaintiffs

confirm that they never received a paycheck or any wage related year-end tax

forms from DHL, doc. 92-6 at, 28:21-29:7; doc. 92-9 at, 21:6-22:11; doc 92-10 at, 50:2-18, and do not dispute that Wood Air prepared the payroll and paid their wages, doc. 98, at 34-35.  In short, this factor also does not support a finding of joint employment.

### 6.    Ownership of Facilities Where Work Occurred

This factor is "probative of joint employment because without land, the worker might not have work, and because a business that owns or controls the worksite will likely be able to prevent labor law violations, even if it delegates hiring and supervisory responsibilities to labor contractors."  *Martinez-Mendoza*, 340 F.3d at 1214.  In *Morrison v. Magic Carpet Aviation*, 383 F.3d 1253, 1255 (11th Cir. 2004), in determining "work premises," the Eleventh Circuit held that a pilot's "worksite was, essentially, the Boeing airplane he flew," because that is where the pilot spent the majority of his time.  The court did not require "fee simple ownership of the worksite; many companies . . . rent or lease office space . . . . Such a lessee undoubtedly 'owns' the worksite of its employees . . . even though its claim to the property is only a leasehold."  *Id*.  However, for the lessee to "own" the worksite, it must have control over the worksite and its employees.  *See id*., at 1255-56.

Here, Plaintiffs state "DHL owned, leased, or paid for all the facilities –

20

including the vehicles – in which plaintiffs (and all other drivers) worked."  Doc. 98, at 38.  The parties agree that the delivery vehicles constituted Plaintiffs' "work premises" because Plaintiffs spent the majority of their time in their vehicles. Doc. 92, at 44; doc. 98, at 35.  However, the Parties disagree on whether DHL or Wood Air owned the delivery vehicles and thus controlled Plaintiffs' worksites. In light of the conflicting contentions, the court turns to the Cartage Agreement which, as it relates to vehicles, states that Wood Air "at its sole cost and expense, shall obtain, furnish, operate, and maintain in good working condition such Contractors Vehicles as may be necessary for Contractor to perform the Services in accordance with the provisions of [the Cartage Agreement]."  Doc. 92-5, at 13 ¶ 3.5.  It provides further that Wood Air is solely responsible for "(a) procuring necessary titling, licensing, permits, and registration; (b) furnishing all fuel, lubricants, and other supplies and consumables; (c) obtaining appropriate insurance coverage . . .; and (d) bearing all other costs and expenses relating to the Contractor Vehicles . . ."  *Id.*, at 13 ¶ 3.5.2.  In exchange, DHL paid Wood Air a $38 "per vehicle" fee to cover Wood Air's expenses to operate the vehicles.  Doc. 92-3, at 126:3-7; doc. 92-5, at 13 ¶ 3.5.

This per vehicle fee, which Plaintiffs claim covered the entire cost of owning, operating, and maintaining the delivery vehicles, is one of the basis for

Plaintiffs' contention that DHL owned the vehicles.  Doc. 98, at 9 ¶ 39.  While

Plaintiffs may believe the vehicle fee covered all operating costs, the law states

clearly that facts, rather than speculation, are needed to defeat summary judgment.

*Ellis,* 432 F.3d at 1326.  In that respect, the unrebutted evidence here includes the

Cartage Agreement, which provided that Wood Air had sole responsibility for

obtaining and maintaining the vehicles.  Doc. 92-5, at 13 ¶ 3.5.  Moreover, Wood

testified that DHL paid the vehicle fee to help Wood Air operate its business and

that the fee only covered some of the costs to operate the vehicles.  *See* doc. 92-3,

at 125:7-126:15.  Furthermore, Wood stated that Wood Air leased some vans with

the option to purchase at the end of the lease and that Wood Air owned some vans

free and clear at the end of the lease.[5]  *Id.*, at 83:21-84:17.  In other words, the

objective evidence shows that Wood Air owned and operated the vehicles.

Indeed, it is unlikely the $38 per vehicle fee covered the entire cost of owning,

operating, and maintaining the vehicles.  Therefore, in light of the express

language of the Cartage Agreement, the minimal $38 vehicle fee, and the evidence

Wood Air provided, the court finds that Wood Air "owned" Plaintiffs' worksite.

     Plaintiffs also make a general assertion that DHL's ownership of the

---

[5] Wood Air can still "own" the vehicles it leased as long as it retains control over the "worksite" and its employees.  *See Morrison*, 383 F.3d at 1255.

warehouse confirms joint employment.  Doc. 98, at 39.  However, this fact is not helpful since Plaintiffs admit that their "worksites" were their delivery vehicles. Doc. 98, at 35.  The vehicles were, of course, owned, leased, and operated by Wood Air.  Moreover, as previously stated, Wood Air, rather than DHL, maintained control over the Plaintiffs.  *See supra* subsection (A)(1) & (2). Furthermore, DHL's ownership of the warehouse is also not helpful to Plaintiffs because the court looks at the "'economic reality' of all circumstances concerning whether the putative employee is economically dependant upon the alleged employer." *Aimable*, 20 F.3d at 439.  Here, because Wood Air owned the delivery vehicles, Plaintiffs were dependant upon Wood Air to provide their "worksites." After all, without the vehicles, Plaintiffs could not have performed their essential job function – delivering and picking up packages.  Thus, Plaintiffs were not economically dependant on DHL for their worksite, and, as a result, this factor also does not support a finding of joint employment.

### 7.  Performance of Job Integral to Business

"This factor is probative of joint employment because a worker who performs a routine task that is integral to the putative employer's business is likely to be dependent on the defendant's overall enterprises." *Beck v. Boce Group, L.C.,* 391 F. Supp. 2d 1183, 1192 (S.D. Fla. 2005); *see also Antenor*, 88 F.3d at 937.

Plaintiffs argue they performed "a routine line-job integral to DHL's business of delivering packages – without delivery drivers, there could be no deliveries for DHL's customers."  Doc. 98, at 39.  DHL disagrees and contends that it was not dependant upon Wood Air because DHL had at least two other independent contractors in the Birmingham area.  Doc. 92-1, at 39:1-19; doc. 92, at 47.  While DHL's contention is correct in the broader context, as it relates though to the Cartage Agreement and the territory assigned to Wood Air, Plaintiffs played an integral part in DHL's business.  However, since Wood Air employed Plaintiffs at-will and technically could have replaced them at any time, this factor alone is not dispositive of the alleged joint employer status at issue here.

### 8.    Investment in Equipment and Facilities

The final factor is the relative degree of investment in equipment and facilities by DHL. "This factor is probative because it is more likely that a worker is economically dependant on the entity that supplies the equipment or the facilities necessary to perform the work in question."  *Beck*, 391 F. Supp. 2d at 1192.  The court must consider "the relative degree of investment in equipment and facilities by the independent contractor on the one hand, and the putative employer on the other."  *Antenor*, 88 F.3d at 937.

Plaintiffs allege that DHL made more substantial of an investment than

Wood Air since DHL owned all the equipment and premises.  Doc. 98, at 35.  It is undisputed that DHL owned the premises and permitted Wood Air "reasonable use of its premises" in exchange for a $30.00 administrative fee.  Doc. 92-5, at 43.  It is also undisputed that Wood Air contracted for the use of DHL's hand-held scanning devices on a month-to-month basis.  Doc. 92-5, at 3 ¶ 9, 45.  Furthermore, Wood Air made an investment by leasing and owning the delivery vehicles.  "[I]f we were to apply this factor, however, it would not indicate who [Plaintiffs'] employer was, as both [DHL] and [Wood Air] made investments in equipment and facilities."  *Aimable*, 20 F.3d at 443.  As a result, this factor does not exonerate DHL, nor does it demonstrate that Plaintiffs were economically dependant on DHL.  Therefore, the court excludes this factor from its analysis.

After applying the economics realities test, six of the eight factors show Plaintiffs were not economically dependant on DHL.  Therefore, this court finds that Plaintiffs failed to prove that an employment relationship existed between them and DHL and, accordingly, **GRANTS** DHL's motion for summary judgment.

## B.    Wood Air and Thomas Wood's Liability

The court turns now to Wood Air and Wood's contention that they are due summary judgment in part or in whole, for the following reasons: (1) Plaintiff Katrina Nunnally opted into the case more than three years after she worked for

Wood Air; (2) liquidated damages are not warranted and only a two-year statute of limitation should apply; (3) Plaintiffs DeAngelo Davis and Jeffrey Webb lack standing; and (4) the FLSA's Motor Carrier Act exemption ("MCE") bars the overtime claims.  *See* doc. 91.  The court addresses these contentions *seriatim*.

### 1.     Plaintiff Katrina Nunnally's Claim is Barred by the Statute of Limitations

Katrina Nunnally ("Nunnally") worked for Wood Air from April 5, 2007, to May 5, 2007.  Since the FLSA extends the two year statute of limitations to three years in cases of willful violations, 29 U.S.C. § 255(a), at most, Nunnally had until May 5, 2010, to opt into this action.  However, she waited until June 11, 2010.  Doc. 67.  Therefore, as Plaintiffs concede, doc. 99, at 11, Nunnally's claim is time barred and Wood Air and Wood's motion to dismiss her claim is **GRANTED**.

### 2.     Material Issues of Fact Preclude This Court From Deciding The Willfulness and Liquidated Damages Issues at the Summary Judgment Stage.

Wood Air and Wood move for summary judgment next on Plaintiffs' claim for liquidated damages.  The statute of limitations for FLSA claims is generally two years, and three years for claims "arising out of a willful violation."  *Alverez Perez v. Sanford-Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1162 (11th Cir. 2008).  Moreover, when there is a willful violation, the court may award liquidated

damages.  Wood Air and Wood contend that there is no basis to award liquidated damages because Plaintiffs cannot show a willful violation of the FLSA.

"To establish that the violation of the [FLSA] was willful in order to extend the limitations period, the employee must prove by a preponderance of the evidence that his employer either knew that its conduct was prohibited by the statute or showed reckless disregard about whether it was."  *Id.*, at 1162-63 (*citing McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)).  Reckless disregard is the "failure to make adequate inquiry into whether conduct is in compliance with the [FLSA]."  *Alverez Perez*, 515 F.3d at 1163.  Furthermore, the FLSA provides for liquidated damages in an amount equal to an employee's recovery of unpaid wages for willful violations, 29 U.S.C. § 216(b), and assigns the "judge the role of finding whether the employer acted in subjective and objective good faith for liquidated damages purposes,"  *Alverez Perez*, 515 F.3d at 1163.  However, "the court may, in its sound discretion, award no liquidated damages . . . if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA] . . . ."  29 U.S.C. § 260.

Plaintiffs contend that Wood and Wood Air "ha[ve] not met [their] burden to avoid liquidated damages[]" because from 2005 to 2007, at least four Plaintiffs

placed Wood personally on notice of his and Wood Air's potential obligations under the FLSA.  Doc. 99, at 43.  Specifically, Plaintiffs Likes, Lowe, Nelson, and Scott contend that when they asked Wood about overtime wages, Wood responded "that's just the way it is," that Plaintiffs do not get overtime because they are on salary, or that the DHL contract did not pay Wood Air enough money for it to pay Plaintiffs overtime.  Doc. 92-6, at 111:5-116:9; doc. 92-12, at 90:23-96:2; doc. 92-11, at 38:19-39:21; doc. 92-9, at 53:9-54:6.  Furthermore, Plaintiffs allege that Wood's ignorance or confusion "does not eliminate his burden to demonstrate good faith."  Doc. 99, at 43.  Finally, Plaintiffs contend that by failing to take affirmative steps to investigate his FLSA obligations and to make any reasonable inquiry into whether his conduct complied with the FLSA, Wood showed a reckless disregard of the law.  *Id.*, at 44.  Thus, Plaintiffs allege they are entitled to liquidated damages and a three-year of statute of limitations period.

Wood Air and Wood disagree and maintain that they did not act willfully because (1) no Plaintiff testified that Wood Air knew that its practice of paying a consistent salary violated the FLSA, doc. 91, at 9, (2) Wood believed that route drivers were exempt from overtime, doc. 92-3, 64:5-65:20; 68:17-68:22, and (3) Wood relied on "a reasonable, even if now abandoned, belief that route drivers were exempt from overtime," doc. 91, at 14.  Finally, Wood Air and Wood

28

contend that "the absence of willfulness is an appropriate question for this Court to determine as a matter of law upon a motion for summary judgment." Doc. 91, at 9 (citing *Schneider v. City of Springfiend*, 102 F. Supp. 2d 827, 837 (S.D. Ohio 1999)). However, *Schneider* is distinguishable because the court found no genuine issue of material fact existed on the willfulness issue. *Id.* Here, there is a disputed issue as to whether Wood Air acted recklessly by failing to make an adequate inquiry into whether its conduct violated the FLSA after Plaintiffs questioned Wood about overtime. Furthermore, Plaintiffs allege essentially that Wood knew the law required him to pay overtime because he responded, in part, to their inquiries by stating he did not have enough money, doc. 92-3, at 68:17-70:10; doc. 99, at 43-44, which, of course, is obviously not a valid defense. Whether Wood made this statement and, what factor, if any, it played in the decision to deny Plaintiffs overtime are matters for a jury to decide. Therefore, this court finds that, based on the alleged facts here, the willfulness determination is not appropriate at the summary judgment stage and, instead, that the court must wait on the jury's findings to determine whether Wood Air and Wood acted in subjective and objective good faith to decide whether liquidated damages are warranted in the event Plaintiffs prevail. *See Alverez Perez*, 515 F.3d at 1163. Accordingly, the motion for summary judgment on the liquidated damages claim

is **DENIED**.

### 3.    Plaintiffs DeAngelo Davis and Jeffrey Webb Have Standing

Wood Air and Wood challenge next Plaintiffs Davis and Webb's standing to pursue their claims because both failed to list their claims as an asset in bankruptcy petitions they filed.  Doc. 91, at 29.  Thus, allegedly, both Davis and Webb's overtime claims are property of their respective bankruptcy estates.  *Id.*  Plaintiffs disagree and allege the bankruptcy court dismissed their petitions on motions by the trustees due to their failure to meet certain obligations and that the dismissals allow both "to pursue their overtime claims in their own names in federal district court."  Doc. 99, at 11.

Wood Air and Wood are correct in their assertion that "upon the filing for a petition for bankruptcy, 'all of the debtors' legal and equitable interests are transferred to the bankruptcy estate."  Doc. 91, at 34 ((citing *United States ex rel. Gerbert v. Transport Admin. Servs*., 260 F.3d 909, 913 (8th Cir. 2001) (citing 11 U.S.C. § 541(a)(1))).  Moreover, they are also correct that the bankruptcy estate encompasses conditional, future, speculative, and equitable interests of the debtor.  *Id.*  However, these contentions are not applicable to Davis and Webb for several reasons.  First, as to Webb, the bankruptcy court dismissed Webb's case for failure to make plan payments on January 1, 2009, and Webb did not opt into the case

until over 15 months later, on April 22, 2010.  *In re Jeffery Tyrone Webb*, 2:08-bk-2193-BGC13, doc. 18; doc. 64.  Thus, at the time Webb filed his bankruptcy petition in 2008, he did not have a claim in this court and may not have known then that Wood Air owed him overtime.  After all, Wood Air and Wood acknowledge that they told Plaintiffs they were not entitled to overtime. Therefore, since Wood Air and Wood have not presented any evidence to show that Webb knew prior to January 1, 2009, that he had an overtime claim, they have failed to establish that dismissal is warranted for a claim Webb may only have learned about after the dismissal of his bankruptcy petition.

Second, as it relates to Davis, Davis filed a Chapter 13 petition on August 25, 2010,  *In re DeAngelo Jerome Davis*, 2:10-bk-05086-TOM13, doc. 38, and the bankruptcy court subsequently dismissed his case for failure to file information on September 24, 2010, and officially closed the case on December 16, 2010.  *Id.* Davis opted into this case on May 27, 2010, four months prior to filing for bankruptcy; therefore, Davis's lawsuit initially was part of the bankruptcy estate. Had Davis's case continued, he would have no standing to pursue this FLSA case. However, the dismissal of Davis's bankruptcy case meant that Davis never cheated his creditors out of this lawsuit asset because the debtors never had to write off any of Davis's debts.  Indeed, a dismissal of a bankruptcy case "revests the

property of the estate in the entity in which such property was vested immediately before the commencement of the case . . . ." 11 U.S.C.A. § 349.  In light of this fact, the policy reasons that militate in favor of judicial estoppel, should be estopped, – *Burnes v. Pemco Aeroplex, Inc*., 291 F.3d 1282, 1286 (11th Cir. 2002) (internal citations omitted) ("A debtor seeking shelter under the bankruptcy laws must disclose all assets, or potential assets . . . Full and honest disclosure . . . is 'crucial to the effective functioning of the federal bankruptcy system.'"), – simply do not apply here.  Since Davis never obtained the benefits of bankruptcy in light of the dismissal of his case, the court declines to find that he is judicially estopped from pursuing this FLSA case.  *See id.* at 1288 (affirming judicial estoppel because plaintiff benefitted from his failure to disclose his lawsuit asset: "It is unlikely he would have received . . . a no asset, complete discharge had his creditors, the trustee, or the bankruptcy court known of a lawsuit claiming millions of dollars in damages.").  Instead, the court finds that Davis, like Webb, has standing to pursue his overtime claims.  Accordingly, Wood Air and Wood's motion is **DENIED**.

   **4.    FLSA's Motor Carrier Act Exemption does not Bar Plaintiffs' Overtime Claims.**

Wood Air and Wood claim next that they are entitled to the Motor Carrier

Act exemption, which exempts from overtime pay "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of the [Motor Carrier Act ("MCA")]." *Walters v. American Coach Lines of Miami, Inc.*, 575 F.3d 1221, 1226 (11th Cir. 2009) (citing 29 U.S.C. § 213(b)(1)) (internal quotations omitted). "Congress created this exemption to eliminate any conflict between the jurisdiction exercised by the Department of Labor ("DOL") over the FLSA and the mutually exclusive jurisdiction exercised by the DOT over the MCA." *Id*. Significantly, though, the FLSA exemptions are construed narrowly against the employer, and the employer has the burden to show that an exemption applies. *Id.*, at 1226.

"The [MCA] grants authority to the Secretary of Transportation to regulate the maximum hours of service of employees who are employed (1) by a common carrier by motor vehicle; (2) engaged in interstate commerce; and (3) whose activities directly affect the safety of operations of such motor vehicles." *Spires v. County*, 980 F.2d 683, 686 (11th Cir. 1993). The MCA gives the Secretary of Transportation (hereinafter "the Secretary") power to regulate all transportation

described in 49 U.S.C. § 13501.[6]  *Walters*, 575 F.3d at 1227.

"The applicability of the motor carrier exemption 'depends both on the class to which his employer belongs and on the class of work involved in the employee's job.'"  *Abel*, 631 F.3d at 1213  "There are two requirements for an employee to be subject to the motor carrier exemption: (1) his employer's business must be subject to the Secretary of Transportation's jurisdiction under the MCA; and (2) the employee's business-related activities must directly affect the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act."  *Id.* (citing *Walters*, F.3d at 1227) (internal quotations omitted).

Wood Air and Wood contend that they qualified for the exemption on each Plaintiff under at least one of four applications: (1) the pre-August 10, 2005, (2) the one-year additional limitation of liability, (3) the post-August 10, 2006, and (4) the 4-month rule.  Doc. 91, at 15 n.4.  Specifically, they allege that Plaintiffs' pre and post-August 10, 2005, claims are exempt due to definitional changes in the

---

[6]The statute provides in relevant part: "The Secretary and the Board have jurisdiction . . . over transportation by motor carrier and the procurement of that transportation . . .(1) between a place in – (A) a State and a place in another State; [and] (B) a State and another place in the same State through another State . . ."  49 U.S.C. § 13501(1).

law and that there is no prohibition of both exemptions applying to the same individual.[7]  *Id.*  Furthermore, they contend that the "4-month rule"[8] applies and provides a separate method of applying the exemption because its applicability is much broader than other methods.  *Id.*  Plaintiffs disagree and contend that Wood Air and Wood failed to prove that the MCA's exemption applied to them.  Doc. 99, at 19.  For the reasons stated below, summary judgment is **GRANTED** for Wood Air and Wood solely as to Plaintiffs' pre-August 10, 2005, claims.

### A.    Claims Before August 10, 2005

The Secretary may "'prescribe requirements for . . . qualifications and maximum hours of service of employees of' a motor carrier or a private motor carrier." *Abel*, 631 F.3d at 1213.  Specifically, Title 49 "confers jurisdiction on the Secretary of Transportation over transportation by a motor carrier 'on a public highway,' to the extent . . . property . . .[is] transported by motor carrier between a place in . . . a State and a place in another State or a State and another place in the same State through another State." *Id.* (internal quotation marks omitted).  Under

---

[7] Prior to August 10, 2005, the Secretary had jurisdiction over "motor vehicles" used in interstate commerce regardless of the vehicle's weight.  *Abel*, 631 F.3d at 1213.  However, after August 10, 2005, the Secretary only had jurisdiction over "commercial motor vehicles" with a gross weight of at least 10,001 pounds. *Vidinliev*, 581 F. Supp. 2d at 1288; 49 U.S.C. § 31132.

[8] The "4-month rule" requires employers to show that the employee's involvement with interstate commercial motor vehicle transportation occurred no more than *four months* prior to the pay period at issue. *Vidinliev,* 581 F. Supp. 2d at 1286.

Title 49, a motor carrier is defined as "a person providing motor vehicle transportation for compensation." 49 U.S.C. § 13102(14). Moreover, a motor private carrier is defined as a "person, other than a motor carrier, transporting property by motor vehicle when (a) the transportation is as provided in section 13501 of this title; (b) the person is the owner, lessee, bailee of the property being transported; and (c) the property is being transported for sale, lease, rent, or bailment or to further a commercial enterprise." 49 U.S.C. § 13102(15).

Here, Wood Air and Wood contend Plaintiffs Likes, Sanders, Hinson, Scott, Allen, and Bibb, were exempt from overtime payments up until the law changed on August 10, 2005, and one additional year thereafter.[9] Doc. 91, at 19. To prevail on the pre-August 10, 2005, exemption, Wood Air and Wood must show that their transportation of property by motor vehicle was subject to the Secretary's jurisdiction and that Plaintiffs belonged to a class of employees who directly affected "the safety operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act." *Vidinliev v. Carey International, Inc.*, et al., 581 F. Supp. 2d 1282, 1285-86 (N.D. Ga. 2008). Significantly,

---

[9] The court addresses the additional one-year exemption argument *infra* in subsection (B).

Defendants do not have to show that each Plaintiff engaged in interstate motor transportation.  Instead, they must show only that (1) some of their drivers were involved – by evidence of actual or solicited trips – in interstate motor vehicle transportation, (2) the involvement with interstate motor vehicle transportation occurred no more than four months prior to the pay period at issue ("four-month rule"), and that (3) Plaintiffs made, or that they reasonably expected Plaintiffs to make, one of those interstate trips.  *Id.* (citing *Reich v. American Driver Serv.*, 33 F.3d 1153, 1156 (11th Cir. 1994)); *Morrison v. Quality Transports Servs., Inc.*, 474 F. Supp. 2d 1303, 1310 (S.D. Fla. 2007).

Therefore, "[t]he real issue is whether the Plaintiffs also belong to a class of employees involved in interstate motor vehicle transportation." *Vidinliev*, 581 F. Supp. 2d at 1286.  "[P]urely intrastate transportation can constitute part of interstate commerce if it is part of a 'continuous stream of interstate travel.'  For this to be the case, there must be a 'practical continuity of movement' between the intrastate segment and the overall interstate flow." *Abel,* 631 F.3d at 1214 (internal quotations omitted).  Furthermore, the interstate commerce requirement is satisfied "where the vehicles do not actually cross State lines but operate solely within a single State, if what is being transported is actually moving in interstate commerce[.]" 29 C.F.R. § 782.7(b)(1).

Here, Plaintiffs never crossed state lines. Nonetheless, because they transported packages that moved in interstate commerce, the interstate requirement is satisfied. *See id.* Moreover, the "practical continuity" between Plaintiffs' intrastate activities and interstate commerce existed because when DHL freight arrived at the warehouse from the airport each morning, Plaintiffs sorted the packages immediately for delivery. Doc. 92-3, at 154-156:8. They left shortly thereafter to deliver the packages to customers. Likewise, when Plaintiffs picked up packages from customers, they took the packages to the warehouse at the end of their shifts for processing and for placement in interstate commerce. Significantly, on either the delivery or the pick-up end, the packages never became stagnant through storage at DHL's warehouse. In other words, although Plaintiffs never left Alabama, their role in delivering and picking up packages contributed to a "continuous stream of interstate travel." Doc. 92-3, at 39:6-39:18, 165:18-166:4. In fact, this point is not in contention because Plaintiffs admit that "[t]here is no dispute that those plaintiffs who worked as drivers delivering and picking-up DHL's packages met the MCE's *interstate-commerce* and *safety-affecting activities requirements*." Doc. 99, at 1 n.1 & 26 (emphasis added). Therefore, Wood Air and Wood are entitled to the motor carrier exemption as it relates to Plaintiffs Likes, Sanders, Hinson, Scott, Allen, and Bibb for overtime claims prior

to August 10, 2005,[10] and  accordingly, their motion for summary judgment is

**GRANTED**.

### B.    One-Year Additional Limitation on Liability

Wood Air and Wood contend next that, as to Likes, Sanders, Hinson, Scott,

Allen, and Bibb, they are entitled to an additional one-year limitation on liability,

running from August 10, 2005, to August 9, 2006, under the Technical

Corrections Act of 2008 ("TCA").  Doc. 91, at 20.  Section 306(b) of the TCA

provides, in relevant part:

> (1) LIMITATION ON LIABILITY.-An employer shall not be liable
> for a violation of section 7 of the Fair Labor Standards Act of 1938
> (29 U.S.C. 207) with respect to a *covered employee* if-(A) the
> violation occurred in the 1-year period beginning on August 10,
> 2005; and (B) as of the date of the violation, the employer did not
> have actual knowledge that the employer was subject to the
> requirements of such section with respect to the covered employee.

*Vidinliev*, 581 F. Supp. 2d at 1290 (quoting Pub. L. No. 110-244, 122 Stat. 1572)

(emphasis added).  A "covered employee" is as an individual:

> (1) who is employed by a motor carrier or motor private carrier (as
> such terms are defined by section 13102 of title 49, United States
> Code, as amended by section 305); (2) whose work, in whole or in
> part, is defined-(A) as that of a driver, driver's helper, loader, or

---

[10] Plaintiffs do not contest this point.  Instead, they focus their claim for overtime on the
post-2005 amendment which specifically limited the MCA exemptions to drivers operating
vehicles that weighed at least 10,001 pounds. Doc. 99, at 26.

mechanic; and (B) as affecting the safety of operation of *motor vehicles weighing 10,000 pounds* or less in transportation on public highways in interstate or foreign commerce . . . .

*Id.*, at 1290 (emphasis added).

It is undisputed that Wood Air was classified as a motor private carrier and that between August 10, 2005, and August 9, 2006, Wood Air employed Likes, Sanders, Hinson, Scott, Allen, and Bibb as drivers responsible for the safe operation of motor vehicles weighing 10,000 pounds or less on public interstate highways.  *See* doc. 99, at 26; doc. 92-3, at 84:18-86:19.  Therefore, these six Plaintiffs were "covered employees."

Because Defendants failed to pay these six Plaintiffs overtime wages during the one-year period beginning on August 10, 2005,[11] the issue then to resolve is whether Wood Air and Wood had actual knowledge about the change in the law. *See Vidinliev*, 581 F. Supp. 2d at 1290;  Pub. L. No. 110-244, 122 Stat. 1572. Defendants can only get the one-year extension if they "did not have actual knowledge" of the requirement that they pay Plaintiffs overtime beginning on August 10, 2005.  *See* Pub.L. No. 110-244 Stat. 1572.  To no surprise, Wood Air

---

[11] These six worked for Wood Air on the following dates: Likes (July 6, 2006 to December 31, 2009); Sanders (November 2004 to April 2008); Hinson (March 1, 2005 to April 23, 2008); Scott (March 5, 2005 to August 12, 2007); Allen (December 1999 to April 12, 2006); Bibb (May 1, 2005 to November 6, 2008).  Docs. 91, at 5; 92-6, at 103:16-18; 26, 33, 34, & 36.

and Wood allege they had no knowledge of the change in the law until after Plaintiffs filed this action.  *See* doc. 92-3, at 64:5-65:20, 68:17-68:22.  The court simply cannot resolve this issue at the summary judgment stage since, ultimately, a resolution hinges on credibility determinations which are, of course, the province of the jury.  After all, as the court pointed out earlier, Plaintiffs maintain that Wood responded to their inquiries about overtime, in part, by allegedly stating that he did not have sufficient funds to pay Plaintiffs overtime.  In light of this alleged testimony, the court simply cannot find as a matter of law that Wood and Wood Air's failure to pay Plaintiffs overtime after August 2005 rested solely on their unfamiliarity with the change in the law.  Therefore, the motion is **DENIED** on Defendants' contention that they are due an additional year on the MCA exemption.

### C.    Claims After August 10, 2005

"Before August 10, 2005, the definition of 'motor carrier' was 'a person providing *motor vehicle* transportation for compensation.'"  *Vidinliev*, 581 F. Supp. 2d at 1288 (citing 49 U.S.C. § 13102) (emphasis added).  This definition changed on August 10, 2005, when Congress passed the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy of Users ("SAFETEA-LU"), to "a person providing *commercial motor vehicle* (as defined in [49 U.S.C.]

41

§ 31132) transportation for compensation." *Id.* (quoting Pub. L. No. 109-59, 119

Stat. 1144 (2005)) (emphasis added).  The relevant provision in § 31132, which

lists the definitions pertaining to commercial motor vehicle safety, is the

restriction to vehicles weighing *at least* 10,001 pounds:

> (1**)** "commercial motor vehicle" means a self-propelled or towed vehicle
> used on the highways in interstate commerce to transport passengers or
> property, if the vehicle–

> (A) has a gross vehicle weight rating or gross vehicle weight of at least
> *10,001 pounds*, whichever is greater; . . .

49 U.S.C.A. § 31132 (emphasis added).[12]  Basically, SAFETEA-LU limited the

_____

[12]Subsequently, on June 6, 2008, Congress passed the SAFETEA-LU Technical Correction Act of 2008 ("TCA").  *Vidinliev,* 581 F. Supp. 2d at 1288; Pub. L. No. 110-244, 122 Stat. 1572 (2008).  Section 305(a) of the TCA replaced "commercial motor vehicle" in §13102 with "motor vehicle."  *Vidinliev,* 581 F. Supp. 2d at 1288 (citing SAFETEA-LU Technical Corrections Act 305(a), Pub. L. No. 110-244, 122 Stat. 1572).  Therefore, the TCA "restored the definition of motor carrier to its pre-SAFETEA-LU state." *Id.* at 1288.  However, the court in *Vidinliev* held that the TCA is actually not an amendment to the SAFETEA-LU because "'section 13102 of such title' refers to 49 U.S.C. § 13102 and that section of the code was created by the ICC Termination Act of 1995 . . . . Therefore, § 305 of the Technical Corrections Act is an amendment to the ICC Termination Act, which in turn affects the scope of the Motor Carrier Act." *Id.*  Furthermore, "Congress' intent to make the [TCA] retroactive was not unambiguous, so although the historical definition of the motor carrier exemption had been restored by the [TCA], the effect was not retroactive . . . ."  *Lucas v. Bell Trans, et al.*, 773 F. Supp. 2d 930, 938 (D. Nev. 2011) (citing *Vidinliev,* 581 F. Supp. 2d at 1288-91).  The *Vidinliev* court further held that "although the TCA restored the previous definition of 'motor carrier,' it also explicitly reaffirmed protections extended to 'covered employees'– those employees whose work involves the operation of motor vehicles weighing 10,000 pounds or less – notwithstanding the exemption." *Lucas,* 773 F. Supp. 2d at 938 (citing Technical Corrections Act § 306(c)). Thus, even after the passage of the TCA on June 6, 2008, the FLSA's overtime exceptions only apply to drivers whose vehicles weighed at least 10,001 pounds. *Id.* at 939.

Secretary's jurisdiction to individuals transporting property in interstate commerce
and who utilized "transporting vehicle[s] [that] had the greater of a gross vehicle
("GVR") or weight of *at least 10,001 pounds*." *Hernandez v. Brink's Inc*., No. 08-
20717 2009 WL 113406 * 5 (S.D. Fla. Jan. 15, 2009) (emphasis added).
Therefore, under the new law, the MCA exemption extends only to those classes
of employees who:

> (1) Are employed by carriers whose transportation of passengers or
> property by [ *commercial* ] *motor vehicle* is subject to [the Secretary
> of Transportation's] jurisdiction under section 204 of the Motor
> Carrier Act [49 U.S.C. § 31502], and (2) engage in activities of a
> character directly affecting the safety operation of [ *commercial* ]
> *motor vehicles* in the transportation on the public highways of
> passengers or property in interstate or foreign commerce within the
> meaning of the Motor Carrier Act.

*Vidinliev*, 581 F. Supp. 2d at 1292 (citing 29 C.F.R. § 782.2(a)) (citations omitted)
(emphasis added).

Wood Air and Wood have the burden of demonstrating that Wood Air meets
this two-part test, which this court adopts.  To meet the first prong, they must show
that Wood Air was subject to the Secretary's jurisdiction.  This issue is not in
contention because the parties agree that Wood Air was a common carrier, that the
Plaintiffs engaged in interstate commerce, and that the Plaintiffs' job duties
affected the safety operations of motor vehicles on the public highways.  *See* docs.

91, at 17 & 99, at 26; *see also supra* subsection (B)(4)(A).  Similarly, with regards to the second prong, the parties agree that the Plaintiffs "who worked as drivers delivering and picking-up DHL's packages met the MCE's interstate-commerce and safety-affecting activities requirements."  Doc. 99, at 26.  Therefore, under the new law, the only dispute is whether Plaintiffs' intrastate trips occurred in vehicles weighing at least 10,001 pounds and whether Wood Air and Wood can show that they had clear expectations that they reasonably expected Plaintiffs to make such trips. *Hernandez,* 2009 WL 113406 at *5.

Wood Air and Wood assert they can make this showing because, allegedly, for each payperiod between August 9, 2006, until the end of Plaintiffs' employment, "[w]hile the standard vehicle in Wood [Air-Freight's] fleet were delivery vans that weighed less than 10,000 lbs; Wood [Air-Freight] also rented larger trucks which had gross vehicle weights over 10,000 pounds" during Christmas and when larger freight could not fit in the smaller trucks.  Doc. 91, at 25; doc. 92-3, at 14: 16-20, 83:7-18, 84:18-85:19.  Moreover, Wood Air and Wood contend they could have assigned any of the drivers, including Plaintiffs, to drive the rented trucks and that they had a reasonable expectation that Plaintiffs would operate the larger rental trucks. *Id.*  Therefore, they claim they are entitled to the exemption even after the enactment of SAFETEA-LU.

Plaintiffs disagree and contend that Defendants failed to meet their burden, in part, because the sole evidence Defendants provide in support of the trucks' weight is Wood's testimony.  Doc. 99, at 31.  Moreover, Plaintiffs assert that the cut-off for overtime depended upon whether the trucks weighed "at least *10,001* pounds," and not simply "more than 10,000[lbs]," as Wood alleges.  Doc. 99, at 30 n.9 (emphasis added).  In other words, while a truck weighing 10,000 and a ½ pounds, for example, meets Wood's contention that he and Wood Air rented trucks that weighed "more that 10,000 [lbs]," technically, such a truck would not fall within the SAFTEA-LU definition of a commercial motor vehicle.  Furthermore, Plaintiffs contend that no reasonable expectation existed under the four-month rule that Plaintiffs may operate commercial motor vehicles.  Doc. 99, at 33; doc. 100-1; doc. 100-2; doc. 100-3.  Finally, Plaintiffs maintain that the best evidence that they only drove "small light-weight" vans is discerned from the fact that they received no training to drive commercial vehicles, doc. 99, at 34; doc. 100-1; doc. 100-2; doc. 100-3, that Wood Air and Wood did not "require [P]laintiffs, as a condition of their employment, to satisfy the minimum mandatory qualifications prescribed by the Federal Motor Carrier Safety Administration to

operate a commercial vehicle,"[13] doc. 99, at 34; *see also* doc. 100-1; doc. 100-2; doc. 100-3, and that "[n]o one employed by Wood Air, Thomas Wood, or DHL ever required or instructed [Plaintiffs] to have a physical examination or to obtain a certificate from a medical examiner indicating that [Plaintiffs were] physically qualified to operate a commercial vehicle in interstate commerce, as a condition of getting [their] job[s]." Doc. 100-1, at 4 ¶ 13; doc. 100-2, at 4 ¶ 13; doc. 100-3, at 4-5 ¶ 13.

Again, Wood Air and Wood have the burden to show that Plaintiffs drove, or that they expected Plaintiffs to drive, vehicles weighing at least 10,001 pounds. Based on the evidence before the court, Wood Air and Wood failed to meet their burden, in part, because they could not provide the necessary specifics to support their contentions:

> Q.   Can you tell me the specific day or days you rented trucks that
>       weighed more than 10,000 pounds during the time you had a
>       relationship with DHL?

---

[13] The regulations provide that "[a] person shall not drive a commercial motor vehicle unless he/she is qualified to drive a commercial motor vehicle." 49 C.F.R. § 391.41.11(a). Among other things, a person must meet the physical requirements outlined in subpart E – Physical Qualifications and Examinations,  which require that he or she not suffer from certain medical conditions.  49 C.F.R § 391.41.11(b).

A.     No, I can't, no.

Q.     And on those occasions when you rented these trucks that weighed
more than 10,000 pounds, who drove the trucks?

A.     I don't remember that.

Doc. 92-3, at 86:11-19.  Moreover, even ignoring the lack of specifics, Wood Air

and Wood also failed to rebut Plaintiffs' contention that they simply could not

have driven, or be expected to drive, commercial motor vehicles since Wood Air

and Wood provided them no training on such vehicles nor required that they have

a commercial driver's license.  Therefore, a genuine issue of material fact exists

because Wood Air and Wood failed to show that they actually rented the vehicles

in question and that Plaintiffs actually drove or were expected to drive vehicles

weighing at least 10,001 pounds.  Summary judgment on claims after August 9,

2005, is, therefore, **DENIED**.

## IV.  Conclusion

For the foregoing reasons, summary judgment is **GRANTED** in favor of

DHL on all counts in light of Plaintiffs' failure to establish that DHL qualified as

their joint employer.  Likewise, Wood Air and Wood's motion on Plaintiffs' FLSA

claims prior to August 9, 2005, and the claims asserted by Katrina Nunnally is

**GRANTED** and, in all other respects, their motion is **DENIED**.

**DONE** and ordered this 7th day of March 2012.

_____
ABDUL K. KALLON
UNITED STATES DISTRICT JUDGE